**CONNOR v. CITY OF UNIVERSITY PARK et al.**

**No. 13002.**

Court of Civil Appeals of Texas. Dallas.

June 8, 1940.

Rehearing Denied July 6, 1940.

Burford, Ryburn, Hincks & Charlton, Logan Ford, and W. M. Taylor, Jr., all of Dallas, for appellant.

Percy C. Fewell, of Dallas, for appellees.

LOONEY, Justice.

Dr. T. V. Connor, Jr., the appellant, instituted this proceeding against the City of University Park and its officials, under the provision of Art. 1011g, Vernon's Ann. Civ.St., to review the action of the Board of Adjustment of said City in affirming the building engineer's refusal to grant appellant a permit, authorizing the remodeling of the interior of his family residence, in the single-family dwelling district of said City, for use as an office for the practice of dentistry, praying that mandamus issue, compelling the proper officials of said City to issue a permit for such purposes, and to enjoin the enforcement officers of the City from interfering with or molesting appellant or his patients in utilizing the left wing of his residence as a private office for the practice of his profession.

In their verified answer, appellees (defendants below) set out, somewhat at length, the zoning ordinance, alleging its reasonableness, the necessity for its enactment, its constitutional validity as applied to appellant and his property, alleging that, more than twenty million dollars had been invested in single-family homes in the vicinity surrounding Southern Methodist University; that there had been built up, and was being maintained, a cultural, homelike environment and atmosphere; that the classification, restrictions and regulation as to the use of property in said district, involving the property in question, are parts of a complete, comprehensive plan of zoning for the entire City of University Park; and that, to relax its enforcement, as sought by appellant, would seriously imperil the entire zoning

plan and program, produce anxiety and confusion among property owners and residents of the district disturbing to their peace of mind, pleasure and confidence, creating a feeling of insecurity in regard to home ownership in said district, and causing the loss of property values, exceeding many times the value of appellant's property; would invite the entry into the district of other similar and kindred professions and occupations, increasing traffic and other hazards, also the cost of operating the municipality, that would be a menace to the public health, safety and general welfare of the community; alleging further, that appellant is misrepresenting his intentions, in that, if granted the permit sought, he intends to and would use his residence to operate a dental office in such a way as to constitute the carrying on of a business, and not merely as an incident to the use of the property as a home; that the proposed use of the property is neither essential nor incidental to the enjoyment of a bona fide home; wherefore, appellees prayed that the relief sought by appellant be denied.

■ After an exhaustive hearing, the court found the issues in favor of appellees, denying the relief sought by appellant, from which he appealed. Although the statement of facts is quite lengthy (700 pages), no findings and conclusions were requested, or filed by the trial court; hence it is our duty to affirm the judgment, if sustained upon any reasonable theory supported by the evidence and authorized by law.

Cities and incorporated towns and villages find their authority for the enactment of zoning ordinances in Arts. 1011a, 1011b and 1011c of Vernon's Ann.Civ.St. For the promotion of the health, safety, morals and general welfare of the community, governing bodies of these municipalities are authorized to enact zoning ordinances, providing restrictions and regulations in regard to the size of buildings, structures, their construction, alteration, regulate density of population, the use of buildings for trade, industry, residence, or other purposes; also regulations and restrictions in regard to the character of the district, its peculiar suitability for particular uses, "with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality", and that, such regulations shall be uniform for each class or kind of buildings throughout each district.

The material facts are these: In December, 1929, the governing body of the City of University Park adopted a zoning ordinance, creating, among others, a single-family dwelling district, which was amended in September, 1938, before appellant purchased the residence involved, which, at the time, was being used as a single-family residence, and has never been used for any other purpose. The pertinent provisions of the ordinance, as amended in 1938, are these: "In a single-family dwelling district no building or premises shall be used, and no building shall be erected or structurally altered which is arranged or designed to be used, for other than one or more of the following uses:", naming single-family dwellings and accessory buildings, also certain institutions of a public nature, such as public utilities and institutions or places for education, culture, worship, pleasure and recreation, and, further, as follows: "(8) Uses customarily incident to any of the above uses, when located upon the same lot and not involving the conduct of a business; including customary home occupation engaged in by the occupants of the dwelling on the premises and including one private office of a physician, surgeon, dentist, musician, or artist, when situated in the same dwelling used by such physician, surgeon, dentist, musician, or artist as his or her private dwelling and incidental to the enjoyment of such premises as a bona fide home, provided, however, that nothing herein shall be construed to permit the establishment, operation or maintenance of a clinic or the carrying on of any business in such district * * *".

The above represents the status of the regulations at the time appellant made his application for the permit; however, in September, 1939, after the institution of the suit, but before the hearing, the governing body of the City again amended the ordinance, providing that, in a single-family dwelling district, no building or premises could be used for other than one or more of the following uses, to-wit: A single-family dwelling used as the residence of a single family, also certain accessory buildings and public institutions for worship, education, culture, and a telephone exchange; also "(c) The following, but only the following, incidental uses may be permitted in a single-family dwelling district: As a secondary use, but never as a principal use, when indispensably necessary to the enjoyment of

premises for any one of the uses permitted by this section and actually made of the premises, but not otherwise, not more than one room or compartment when located upon the same lot, may be subjected to uses customarily (according to the then prevailing custom in the area and adjacent areas which are exclusively residential in character) incident to any one use authorized by this section, which is actually made of the premises; provided, however, nothing herein shall authorize or be construed to permit the use of any part of premises within a single-family dwelling district for the purpose of conducting or carrying on the business, trade, or professional practice, or for carrying on the business or practice of the rendering of personal, trade or professional service for which a charge is made or any kind of remuneration is required or received by the occupant of the premises except that professional services may be rendered in unusual and occasional emergency cases, when such service is essential to the preservation of life or to the rendering of first-aid; * * *."

It is conceded, and the fact entered into the discussion, that on January 2, 1940 (since the trial of the case), the governing body of the City of University Park again amended the portion of the ordinance under consideration, expressly prohibiting the use of any part of the premises within a single-family dwelling district, for the purpose of conducting or carrying on any business, trade, or professional practice, or giving any professional advice.

With reference to the authority of the governing body of the City to amend the ordinance, the statute (Art. 1011e, Vernon's Ann.Civ.St.) provides that: "Such regulations, restrictions, and boundaries may from time to time be amended, supplemented, changed, modified, or repealed * * *"; therefore, we think, the governing body of the City, in the proper exercise of the police power, was authorized, pending the litigation, to amend the ordinance in the respects mentioned, as appellant acquired no vested right by reason of having filed an application for a permit to remodel and use the residence as an office for the practice of dentistry. It follows therefore, that, if either of the last two amendments adopted is valid, the rights of the parties are to be determined as of the present time, rather than the time the application for a permit was made. See Munn v. People of Illinois, 94 U.S. 113, 24 L.Ed. 77; City of University Park v. Rahl, Tex.Civ.App., 36 S. W.2d 1075; Ware v. City of Wichita, 113 Kan. 153, 214 P. 99; Sunny Slope Water Co. v. City of Pasadena, 1 Cal.2d 87, 33 P.2d 672. State ex rel. v. Christopher, 317 Mo. 1179, 298 S.W. 720; Brett v. Building Commissioner, 250 Mass. 73, 145 N.E. 269.

Appellant contends that, the amendment of September, 1939, in providing that it should not be construed to permit the use of any part of the premises, within a single-family dwelling district, for trade or for the practice of any profession, for which a charge is made or any kind of remuneration is required or received by the occupant of the premises, except that professional services may be rendered in unusual and occasional emergency cases where such service is essential to the preservation of life, or to the rendering of first aid, etc., in effect, was a prohibition of such use, and that, by implication, accomplished the same result sought by the explicit provisions of the amendment of January, 1940.

We are inclined to accept appellant's view in regard to this matter. To say to a homeowner, "You are permitted to use an office in your residence for the purpose of practicing dentistry, provided you render a free service", is to offer but an empty, profitless privilege, and, from a business standpoint, of no value whatever; in effect, is a prohibition of such use. So, we conclude that, whether appellant's rights are to be tested by the provisions of the amendment of September, 1939, or those of the amendment of January, 1940, the same question is presented; that is, whether or not the governing body of the City of University Park was authorized to prohibit the use, by a dentist, of any part of his premises located in a single-family dwelling district, for the practice of his profession. In deciding this question, we must inquire whether or not the exclusion of the practice of dentistry from the residential area was reasonable, that is, bore such relation to the ordinary objects of the police power, as to authorize its exercise in the manner indicated.

The record discloses that quite a number of homeowners in the residential district vigorously oppose the granting of the permit to appellant; a number testified in

regard to the probable effect the use of any part of the premises for the practice of dentistry would have upon the property and neighborhood; some placed their objections largely upon aesthetic grounds. In the nature of the case, the testimony was somewhat speculative, yet we found in it real probative value, in its tendency to show that the establishment of a dental office in the residential district, open to those seeking treatment or relief from suffering, would be an institution foreign to a neighborhood of homes, and not desired by the homeowners; would mar the general plan, increase the ever-present traffic hazard and the opportunity for the spread of contagion, affect adversely the home environment, disturb the privacy of home life, render the section less desirable for homes, and adversely affect property values; and, further, that the invasion of the residential district by one such avocation probably would be the open sesame, admitting others of a similar nature, thus increasing the hazards and multiplying the evils mentioned.

The questions discussed in the 630 printed pages of briefs sweep the gamut of the zoning code, as well as that of the police power. The task presented of studying the briefs—its enormity—was somewhat repelling, but, the task performed, we have the thought that the case was ably and thoroughly briefed and argued by counsel for the parties. However, we are of opinion that there will be found in the doctrines announced by this court in Scott v. Champion Bldg. Co., Tex.Civ.App., 28 S.W.2d 178, in Lombardo v. City of Dallas, Tex.Civ.App., 47 S.W.2d 495, and by the Supreme Court in the latter case, 124 Tex. 1, 73 S.W.2d 475, answers to practically all questions raised and discussed in the instant case.

We must indulge the presumption that the zoning ordinance was validly enacted. The burden rested upon appellant to clearly show that the regulations of which he complains were not authorized under the police power. We do not think it can be said as a matter of law that the exclusion of the practice of dentistry, or any other profession, from the residential district, was either arbitrary, or unreasonable, as having no relation to the public health, safety, morals, or general welfare of the community. The presumption being to the contrary, the burden rested upon appellant to clearly show that the regulation was unreasonable, and if its validity is fairly debatable, we would not be authorized to substitute our judgment for that of the governing body of the City. This doctrine is sustained by authorities the country over. In Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016, the Supreme Court said: "The exclusion from residential districts by zoning ordinances of business and trade of every sort, including hotels and apartment houses, cannot be said to be so clearly arbitrary and unreasonable, and to have no such substantial relation to the public health, safety, morals, and general welfare, as not to be within the police power."—as it must be said, before the ordinance can be declared unconstitutional. Also, in Zahn v. Board of Public Works, 274 U.S. 325, 47 S.Ct. 594, 595, 71 L.Ed. 1074, the same court said: "The common council of the city, upon these and other facts, concluded that the public welfare would be promoted by constituting the area, including the property of plaintiffs in error, a zone 'B' district, and it is impossible for us to say that their conclusion in that respect was clearly arbitrary and unreasonable. The most that can be said is that whether that determination was an unreasonable, arbitrary, or unequal exercise of power is fairly debatable. In such circumstances, the settled rule of this court is that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question." And in Munn v. People, etc., 94 U.S. 113, 132, 24 L.Ed. 77, the same court used the following language: "For our purposes we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the State. But if it could, we must presume it did. Of the propriety of legislative interference within the scope of legislative power, the Legislature is the exclusive judge." In Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475, 486, our own Supreme Court stated the same doctrine, as follows: "The rule is that in order to hold a statute void we must be able to say that it is clearly unconstitutional and to hold an ordinance in-

valid it must be clearly and plainly unreasonable." In Munger, etc., Co. v. City of Groesbeck, Tex.Civ.App., 194 S.W. 1121, 1123, this court, quoting with approval from the Supreme Court of Minnesota, Evison v. Chicago, St. P., M. & O. Railway Co., 45 Minn. 370, 48 N.W. 6, 11 L.R.A. 434, said: "Much must be left to the judgment and discretion of the city counsel, and when they have exercised their judgment and discretion in passing an ordinance it is prima facie valid, and, to justify a court in setting aside their action, its unreasonableness, and the want of necessity for it as a measure for the protection of life and property, must be clear, manifest, and undoubted, so as to amount, not to a fair exercise, but an abuse of discretion, or a mere arbitrary exercise of the power of the council." Continuing the same opinion, this court said: "The presumption is that the ordinance is valid, and repeating what we have already said, when an ordinance like the one we are considering 'is attacked upon the ground that it is unreasonable and therefore void, it is incumbent upon the party who alleges its invalidity to aver and prove the fact which made it so.'" To the same effect, see King v. Guerra, Tex.Civ.App., 1 S.W.2d 373; Harper v. City of Wichita Falls, Tex.Civ.App., 105 S.W.2d 743; Harvey v. City of Seymour, Tex.Civ.App., 14 S.W.2d 901; West Bros. Brick Co. v. City of Alexandria, 169 Va. 271, 192 S.E. 881; Martin v. Danville, 148 Va. 247, 138 S.E. 629.

■ The expansive nature of the police power was satisfactorily stated by the Supreme Court of California, in Miller v. Board of Public Works, 195 Cal. 477, 234 P. 381, 383, 38 A.L.R. 1479, as follows: " * * * the police power, as such, is not confined within the narrow circumscription of precedents, resting upon past conditions which do not cover and control present day conditions obviously calling for revised regulations to promote the health, safety, morals, or general welfare of the public; that is to say, as a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions. What was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power. This is so because: 'What was a

reasonable exercise (of this po
days of our fathers may t
so utterly unreasonable as to m
cult for us to comprehend the
of conditions that would justi
what would by our fathers have
jected as unthinkable is to-day
as a most proper and reasonable excr
thereof.' Streich v. Board of Education, 34 S.D. 169, 147 N.W. 779, L.R.A.1915A, 632, Ann.Cas.1917A, 760."

■ Thus we see that the police power is not static by any means, but may be applied to any new situation, as the necessity demands; therefore, we do not think it can be correctly said that, because dental offices and the practice of dentistry in districts zoned for single-family dwellings has not heretofore been regulated, the subject is without the domain of the police power. In support of this view, we call attention to the language of the Supreme Court of Illinois in City of Aurora v. Burns, 319 Ill. 84, 149 N.E. 784, 788, the court said: "The constantly increasing density of our urban populations, the multiplying forms of industry, and the growing complexity of our civilization, make it necessary for the state, either directly or through some public agency by its sanction, to limit individual activities to a greater extent than formerly. With the growth and development of the state the police power necessarily develops, within reasonable bounds, to meet the changing conditions. [State] Public Utilities Comm. v. City of Quincy [290 Ill. 360, 125 N.E. 374], supra. The power is not circumscribed by precedents arising out of past conditions, but is elastic and capable of expansion in order to keep pace with human progress."

The quotation from Judge Harlan (Chicago, B. & Q. R. Co. v. People of State of Illinois, 200 U.S. 561, 26 S.Ct. 341, 50 L. Ed. 596, 4 Ann.Cas. 1175) by Chief Justice Cureton, in Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 479, states the doctrine that, in our opinion, largely rules the instant case. Judge Harlan is quoted as saying: "Uncompensated obedience to a regulation enacted for the public safety under the police power of the State is not taking property without due compensation, and the constitutional prohibition against the taking of private property without compensation is not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of

rdered community, nor of that er over private property which y for the orderly existence of nments. * * * The learned or the railway company seem to the adjudications relating to the power of the state to protect the public health, the public morals, and the public safety are not applicable, in principle, to cases where the police power is exerted for the general well-being of the community apart from any question of the public health, the public morals, or the public safety. * * * We cannot assent to the view expressed by counsel. We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety." (Citing authorities.)

■ The general welfare is served by the promotion of prosperity and the conservation of values. As before shown, the statute (Art. 1011c), authorizing cities and towns to enact zoning regulations, makes it the duty of such bodies to so regulate as to conserve property values, encourage the most appropriate use of property throughout the municipality; necessarily forbidding any regulation that would affect adversely the value of property, or encourage an inharmonious or inappropriate use thereof. That the authority to accomplish these purposes and intents is inherent in the police power is shown by the decisions of many courts. The Supreme Court of Wisconsin, in State ex rel. Carter v. Harper, 182 Wis. 148, 196 N.W. 451, 454, 33 A.L.R. 269, said: "In this day none will dispute that government in the exercise of its police power may impose restrictions upon the use of property in the interest of public health, morals, and safety. That the same restrictions may be imposed upon the use of property in promotion of the public welfare, convenience, and general prosperity is perhaps not so well understood, but, nevertheless, is firmly established by the decisions of this and the federal Supreme Court. Thus in C., B. & Q. Ry. Co. v. People of the State of Illinois, supra, at page 592, of 200 U.S., at page 349 of 26 S.Ct. (50 L. Ed. 596, 4 Ann.Cas. 1175) it is said: 'We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to

promote the public health, the public morals or the public safety. * * *'" The same court, continuing, also said: "* * It cannot be denied that a city systematically developed offers greater attractiveness to the home seeker than a city that is developed in a haphazard way. The one compares to the other about as a well-ordered department store compares to a junk shop. If such regulations stabilize the value of property, promote the permanency of desirable home surroundings, and if they add to the happiness and comfort of the citizens, they thereby promote the general welfare. * * * The benefits to be derived to cities adopting such regulations may be summarized as follows: They attract a desirable and assure a permanent citizenship; they foster pride in and attachment to the city; they promote happiness and contentment; they stabilize the use and value of property and promote the peace, tranquillity, and good order of the city. We do not hesitate to say that the attainment of these objects affords a legitimate field for the exercise of the police power. He who owns property in such a district is not deprived of its use by such regulations. He may use it for the purposes to which the section in which it is located is dedicated. That he shall not be permitted to use it to the desecration of the community constitutes no unreasonable or permanent hardship and results in no unjust burden."

■ Furthermore, in zoning, the aesthetic consideration is not to be ignored. Harmonious appearance, appropriateness, good taste and beauty displayed in a neighborhood not only tend to conserve the value of property, but foster contentment and happiness among homeowners. This phase of the subject was discussed by the Supreme Court of Louisiana in State ex rel. Civello v. City of New Orleans, 154 La. 271, 97 So. 440, 444, 33 A.L.R. 260, as follows: "* * * if the primary consideration for the enactment of an ordinance limiting the individual's right to use his own property is a substantial consideration of public health, safety, comfort, or general welfare, considerations of taste and beauty may also enter in, and be not out of place. [Citing authorities.] If by the term 'aesthetic considerations' is meant a regard merely for outward appearances, for good taste in the matter of the beauty of the neighborhood itself, we do not observe any substantial reason for saying

that such a consideration is not a matter of general welfare. The beauty of a fashionable residence neighborhood in a city is for the comfort and happiness of the residents, and it sustains in a general way the value of property in the neighborhood. It is therefore as much a matter of general welfare as is any other condition that fosters comfort or happiness, and consequent values generally of the property in the neighborhood. Why should not the police power avail, as well to suppress or prevent a nuisance committed by offending the sense of sight, as to suppress or prevent a nuisance committed by offending the sense of hearing, or the olfactory nerves? An eyesore in a neighborhood of residences might be as much a public nuisance, and as ruinous to property values in the neighborhood generally, as a disagreeable noise, or odor, or a menace to safety or health. The difference is not in principle, but only in degree." (Citation of authorities.) To the same effect, the Supreme Court of Minnesota, in State v. Houghton, 144 Minn. 1, 174 N.W. 885, 176 N.W. 159, 162, 8 A.L.R. 585, said: "Another reason is that giving the people a means to secure for that portion of a city, wherein they establish their homes, fit and harmonious surroundings, promotes contentment, induces further efforts to enhance the appearance and value of the home, fosters civic pride, and thus tends to produce a better type of citizens. It is time that courts recognized the æsthetic as a factor in life. Beauty and fitness enhance values in public and private structures. But it is not sufficient that the building is fit and proper, standing alone; it should also fit in with surrounding structures to some degree. People are beginning to realize this more than before, and are calling for city planning, by which the individual homes may be segregated from not only industrial and mercantile districts, but also from the districts devoted to hotels and apartments." To the same effect, see Ware v. City of Wichita, 113 Kan. 153, 214 P. 99, from the Supreme Court of Kansas.

So, we conclude that, as authorized by the provisions of the controlling statute, the governing body of the City, in the exercise of its police power, was justified in prohibiting the use of premises in the residential district for the practice of dentistry, and that, in prohibiting such use, the governing body was authorized to give due consideration to the conservation of property values, the lessening of congestion in the streets, the prevention of undue concentration or overcrowding of the population, the appropriate use of land throughout the municipality, and to the preservation of attractive homes and home surroundings.

However, appellant contends that, by express provisions of the ordinance and by condoning certain uses, the City of University Park permits the establishment and operation in the dwelling district of certain uses that are equal, if not greater, hazards to the health, morals, safety and general welfare of the community, than would be produced by the establishment and operation of a dental office, thus the regulation discriminates against and denies to appellant equal protection of law, in violation of the Constitution.

The following are the pertinent facts: No dental office is being maintained in the dwelling district; the ordinance forbids alike the practice of the profession of dentistry and all other professions; there is only one private school in the district, which will move within a few months on the expiration of its lease; the amendments of September, 1939, and of January, 1940, permit, in the residential district, one church, chapel, library, kindergarten, public park, fire station, school or college, when and if—but only when and if—the lot or lots on which the same are located contain not less than 30,000 square feet of land, and the exterior of the structures so used are not less than 50 feet from each of the side lines of the lot; also, a telephone exchange, but not a public business office, repair or storage facilities; it also appears that the City authorities have heretofore condoned the use, by an architect, of an office in his residence, within the district, located about two miles from the residence of appellant. The above constitute the permitted uses, also the condoned use seized upon by appellant as basis for the contention that he is being discriminated against and denied equal protection of the law.

We cannot accept appellant's view in regard to this matter. It is a matter of general knowledge that offices for the practice of dentistry and other kindred professions, in conformity to a sense of appropriateness, or fitness of things, usually are located in the business areas of cities and towns, and that it is unusual to

find them in residential areas. On the contrary, public utilities, places of worship, schools and other cultural institutions, places of recreation and pleasure, usually are found accessible to the homes of the community, and, in our opinion, their location in such places makes for the convenience and welfare of the people. The lone architect, located two miles from the vicinity of appellant's residence, it seems, has been tolerated, although we think such a business is within the terms of the amendments, both of September, 1939, and of January, 1940; but, even if not, the regulation would not, because of that fact, be invalid, as the governing body of the City was not bound to extend the regulation to all whom it could have included.

In West Coast Hotel Co. v. Parrish, 300 U.S. 379, 414, 57 S.Ct. 578, 585, 81 L.Ed. 703, 108 A.L.R. 1330, Chief Justice Hughes said: "This Court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach." The same court, in United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 783, 82 L.Ed. 1234, used the following pertinent language: "Appellee raises no valid objection to the present statute by arguing that its prohibition has not been extended to oleomargarine or other butter substitutes in which vegetable fats or oils are substituted for butter fat. The Fifth Amendment has no equal protection clause, and even that of the Fourteenth, applicable only to the states, does not compel their Legislatures to prohibit all like evils, or none. A Legislature may hit at an abuse which it has found, even though it has failed to strike at another." And in two recent cases, New York Rapid Transit Corp. v. City of New York (Brooklyn & Queens Transit Corp. v. City of New York), 303 U.S. 573, 58 S.Ct. 721, 724, 82 L.Ed. 1024, Justice Reed, speaking for the Supreme Court, used the following language: "No question is or could be made by the corporation as to the right of a state, or a municipality with properly delegated powers, to enact laws or ordinances, based on reasonable classification of the objects of the legislation or of the persons whom it affects. 'Equal protection' does not prohibit this. Although the wide discretion as to classification retained by a Legislature often results in narrow distinctions, these distinctions, if reasonably related to the object of the legislation, are sufficient to justify the classification." In Soon Hing v. Crowley, 113 U.S. 703, 704, 5 S.Ct. 730, 733, 28 L.Ed. 1145, Judge Field, speaking to the same point, used the following language: "The discriminations which are open to objection are those where persons engaged in the same business are subjected to different restrictions, or are held entitled to different privileges under the same conditions. It is only then that the discrimination can be said to impair that equal right which all can claim in the enforcement of the laws." And in Francois Giozza v. Patrick Tiernan, 148 U.S. 657, 13 S.Ct. 721, 723, 37 L.Ed. 599, Chief Justice Fuller announced the same doctrine; he said: "It is enough that there is no discrimination in favor of one, as against another of the same class [authorities cited]. And due process of law, within the meaning of the amendment, is secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government. Leeper v. Texas, 139 U.S. 462, 11 S.Ct. 577 [35 L.Ed. 225]".

So we overrule the contention that the regulation in question denies appellant equal protection of the law.

Appellant contends further that, the amendments to the zoning ordinance, adopted in September, 1939, and in January, 1940, being void, because of the absence of any relation to either the health, morals, safety, or general welfare of the community, his application for the permit should have been granted under the express provisions of the amendment of September, 1938, in that he sought, and the amendment permitted, the remodeling of his residence and its use for the practice of dentistry, as an incident to the enjoyment of his home. As heretofore stated, appellees denied that appellant intended to practice dentistry simply as an incident to the use of his home, but alleged that he was misrepresenting his intentions and, if granted the permit sought, intended and would use the premises for the practice of dentistry as a business.

This being one of the issues joined by the pleadings, in view of the judgment for appellees, we must indulge the presumption that the issue was correctly found in their favor, that is, if supported by evidence.

By a specific provision of the ordinance in question, permission was given a phy-

sician, dentist, etc., to maintain a private office in his residence, provided the permitted use was merely incidental to the enjoyment of the premises as a bona fide home, and did not involve the carrying on of a business. The Board of Adjustment that examined the facts and rejected appellant's application for a permit, made a full report and assigned reasons for the action. Omitting the first, second and ninth paragraphs, the report in full is as follows:

"(3) The application for a permit to make structural changes in the building at 6014 Preston Road, which application was denied and not granted by the Building Inspector of the City of University Park, if granted, would permit the appellant to so alter the structure now adaptable to use exclusively as a bona fide place of residence, as to provide a large living room, usuable as a reception room, an examination room, a record room, a laboratory, an X-ray developing room, and X-ray diagnosis room, and a consultation room.

"(4) Although the appellant expresses an intent to use and occupy the premises as a bona fide home, the application for the permit to make the structural changes in the building on Lot 7 of Block E of St. Andrews Place Addition, shows that when the structural changes have been completed there will be only one room available for use as a bedroom and that room has an open west exposure and an exposure to the north which is interrupted by the garage only a few feet away.

"(5) That if the structural changes, for which authority is requested, are made, the property will not be used as a single-family dwelling.

"(6) That the use proposed by Dr. Thomas V. Connor is, in reality, a business use, and that the property, if structurally altered and used as the appellant proposes to use it, will be used for the professional business of a dentist, wherein there would be offices, accessible to the public, especially to the clients and patients of a dentist.

"(7) That the use proposed to be made of the property, by the appellant, and that use which would result from the structural changes for which a permit has been denied, are not uses customarily incident to any of the uses authorized in a 'Single-Family Dwelling' District by the Zoning Ordinances now in effect in the City of University Park.

"(8) That it is not customary for dentists to have public offices, consultation rooms, laboratories, record rooms or X-ray development compartments, or X-ray diagnosis rooms in their place of dwelling and that such use is neither essential nor incidental to the enjoyment of the premises herein involved as a bona fide home. * * *

"(10) That the appellant desires to make use of the premises in carrying on his professional career which is not an incidental use but is the principal use to which the premises would be subjected were the permit granted."

■ For the reasons stated, the Board of Adjustment refused appellant's application for the permit sought. The facts and circumstances in evidence sustain the conclusion reached by the Board, and, in our opinion, were sufficient to justify the trial court in reaching the same conclusion. So, if we should accede to appellant's contention, that is, that the amendments of September, 1939, and of January, 1940, are void, and that he is entitled to invoke the provisions of the amendment of September, 1938, still, his good faith, in regard to the use he intends to make of the premises, having been successfully impeached, he would not be entitled to recover on that theory.

Appellant also contends that the provision of the amendment of 1938, prohibiting the carrying on of a business in the residential area, has no application whatever to his case, in that he does not propose to establish a business, but intends to practice a profession.

■ We cannot accept appellant's view. The term "business" has no definite or legal meaning. It is of extensive use, flexible, of large significance, and when construed in statutes, its meaning depends upon the context and the evident purpose of the legislative body. 12 C.J.S., Business, pp. 761, 762. The term "business" is applicable to any particular employment, occupation, or profession followed as a means of livelihood; in this sense, the word has been defined in general as meaning calling, employment, trade, or avocation. 12 C.J.S., Business, p. 766.

So, when it is understood that the dominant purpose of the governing body of the

City of University Park was to regulate and restrict the "use of buildings, structures, and land for trade, industry, residence, or other purposes" (Art. 1011a), it is obvious, we think, that the term "business" employed, was intended to apply to all professions as well as to trades, industries, or other avocations pursued for a livelihood; and that, by permitting the homeowner to maintain an office in his residence, in aid of such pursuit, it was not intended that such use should be or become the principal, rather than the incidental, use of the premises.

It follows from what has been heretofore said that we are of opinion the trial court did not err in refusing appellant the relief sought; therefore, the judgment below is affirmed.

Affirmed.